Melvin L. Hair and Esther Hair v. Commissioner. Richard E. Hair and Naomi L. Hair v. Commissioner.
Hair v. Commissioner
Docket Nos. 3297-65, 5001-65.
United States Tax Court
T.C. Memo 1967-22; 1967 Tax Ct. Memo LEXIS 238; 26 T.C.M. (CCH) 127; T.C.M. (RIA) 67022; 26 Oil & Gas Rep. 579; February 9, 1967
Cameron Sherwood, 601 Baker Bldg., Walla Walla, Wash., for the petitioners. Lester R. Uretz and Richard G. Daly, for the respondent. FAY
Memorandum Opinion FAY, Judge: Respondent determined deficiencies in the Federal income taxes of petitioners for the years 1962 and 1963 as follows: Docket No.
Petitioner
Year
Amount
3297-65
Melvin L. and Esther Hair
1962
$ 294.63
1963
5,129.62
5001-65
Richard E. and Naomi L. Hair
1962
351.72
1963
4,472.11
The sole issue for determination is whether income received by petitioners from the operator of a sand and gravel pit located on land owned by petitioners was taxable to them as capital gain or ordinary income. [1]
*239 All of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is hereby incorporated by this reference. Melvin L. Hair, a farmer (hereinafter sometimes referred to as Melvin), and Esther Hair, husband and wife, were residents of Prescott, Washington. They filed their joint Federal income tax returns for the years 1962 and 1963 with the district director of internal revenue for the State of Washington. Richard E. Hair, also a farmer (hereinafter sometimes referred to as Richard), and Naomi L. Hair, husband and wife, were residents of Walla Walla, Washington. They filed their joint Federal income tax returns for the years 1962 and 1963 with the district director of internal revenue for the State of Washington. Melvin and Richard (hereinafter sometimes referred to collectively as petitioners) are brothers. On the death of their mother, Edith A. Hair, on October 23, 1954, they each became the owner of an undivided one-half interest in certain lands located in the State of Washington. Parts of these lands were suitable for farming operations and parts were generally considered to be wastelands. Some time after Melvin and Richard *240 became the owners of these lands, test borings were conducted on the properties by the Curtis Construction Company (hereinafter referred to as Curtis). The test borings revealed that the lands contained deposits of sand and gravel. Curtis was a subcontractor on a construction project relating to the Lower Monumental Dam on the Snake River in the State of Washington. Under its agreement with the prime contractor on the dam project, Curtis was to furnish all the sand and gravel for the construction of the south shore portion of the dam. On April 11, 1962, Melvin and Richard (seller) entered into a written agreement with Curtis (purchaser). [2] This agreement provided, inter alia: That in consideration of the sum of Ten Dollars ($10.00), receipt of which is hereby acknowledged, and of the stipulations herein contained, and the payments to be made as hereinafter specified, the Seller hereby agrees to sell to the Purchaser, and the Purchaser hereby agrees to purchase from the Seller, the following in and to the sand and/or gravel situate upon the following described premises: * * * This agreement shall remain in full force and effect for such a time as shall be required to enable *241 Purchaser to complete its contract with the Prime Contractor related to construction of Lower Monumental Dam on the Snake River under which contract Purchaser has agreed to furnish all sand and gravel for construction of the south shore portion of said Dam. It is estimated that performance of the said contract by Purchaser shall take approximately three (3) years from the date of this Agreement but that Purchaser shall, nevertheless, have the full time necessary to complete said contract. In the event of the abandonment of said contract by Purchaser, this contract shall be deemed terminated. Purchaser agrees to pay unto Seller Fifteen Cents (15") per cubic yard of sand and/or gravel removed from the said lands of Seller pursuant to this Agreement. * * * Beginning in the year 1962 and ending in the year 1964, *242 Curtis removed quantities of the desired sand and made the payments to Melvin and Richard as required by their contract. Later in 1964, Curtis performed its subcontract on the dam project and abandoned the instant contract. In accordance with its terms, the agreement was deemed terminated and the right to exploit the unmined sand and gravel reverted to Melvin and Richard. On their returns for the years 1962 and 1963 Melvin and Richard reported the payments received from Curtis as income from the sale of a capital asset, i.e., deferred payments from the sale in 1962 of the sand and gravel in place. Respondent, in his statutory notices of deficiency, determined that the amounts received under the contract represented ordinary income and not capital gain as reported by petitioners. As the contract between petitioners and Curtis was not intended to and did not effect an immediate sale of all the sand and gravel in place, it cannot be said that petitioners transferred their entire interest by means of the contract. Instead, they retained an economic interest in the sand and gravel in place. Under the terms of the contract the amounts received from Curtis were compensation for the *243 exhaustion of that interest if and when a quantity of sand and gravel was removed. Under these circumstances the amounts received under the contract were properly taxable as ordinary income. The sole issue for determination is whether the payments received by Melvin and Richard, under the contract with Curtis, represent capital gain or ordinary income. The proper characterization of these receipts for Federal income tax purposes is dependent upon the actual effect of the contract between the parties. If by this agreement the petitioners transferred their entire interest in the sand and gravel in place, then the receipts are capital gain. If however, they have not transferred their entire interest (i.e., they have retained an economic interest) and the receipts under the contract are to compensate them for the exhaustion of this retained interest, then the receipts are ordinary income. See Palmer v. Bender, 287 U.S. 551 (1933); and Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25 (1946). In short, we must determine whether the petitioners have retained an economic interest in the sand and gravel in place. The Supreme Court has stated that an economic *244 interest is retained where the owner (1) has acquired, by investment, any interest in the natural deposit in place; and (2) must look to the income derived from the extraction of said natural deposit for the return of his capital. Commissioner v. Southwest Expl. Co., 350 U.S. 308, 314 (1956), citing Palmer v. Bender, supra. The crux of our problem, since the petitioners herein are, at the time of the contract, the owners of the land and the sand and gravel thereon, is to determine whether they meet the latter part of the Supreme Court's definition (i.e., whether they have retained a right under the contract which looks solely to the extraction of the sand and gravel for the return of their capital investment). Petitioners contend that their contract with Curtis effected a present sale of their entire interest in the sand and gravel in place. They stress that the contract employs the language of purchase and sale and specifically states that what is transferred is "all of the Sellers' right, title and interest in and to the sand and/or gravel." Respondent, on the other hand, contends that the contract did not effect a present sale of petitioners' entire *245 interest in the sand and gravel in place. He argues that the petitioners retained an economic interest in the sand and gravel measured by the right to receive fifteen cents per cubic yard if, as, and when removed. We agree with respondent. Initially, in determining the substance of this transaction, we must look not only to the language of the agreement but also to the circumstances surrounding it. See Charles H. Remer, 28 T.C. 85 (1957), affd. 260 F. 2d 337 (C.A. 8, 1958); Wesley W. West, 3 T.C. 431 (1944), affd. 150 F. 2d 723 (C.A. 5, 1945), certiorari denied 326 U.S. 795-796 (1945). The contract as a whole, when read in conjunction with the surrounding circumstances, stipulated to by the parties, reveals the following situation: Curtis, a subcontractor, was desirous of acquiring sand and gravel in order to fulfill its subcontract on a dam construction project. After tests revealed that petitioners' lands contained deposits of sand and gravel, Curtis contracted with petitioners for a consideration of $10 for the right to remove as much of the sand and gravel as it required on the dam project. Curtis agreed to *246 pay petitioners at the rate of fifteen cents per cubic yard removed. Curtis was in no way obligated to remove any of the sand and gravel nor was it, by the terms of the contract, obligated to make any payments (apart from the $10 already noted) to the petitioners. Indeed, any further payments became due and owing from Curtis to petitioners only if, as, and when Curtis actually removed sand and gravel from the premises owned by the petitioners. The duration of Curtis' right to remove the sand and gravel was to be measured solely by the duration of its subcontract on the dam project. Though the parties estimated that Curtis' performance under the subcontract would require approximately three years, they specifically provided that their contract would terminate on Curtis' termination or abandonment of the subcontract whenever that happened to occur. At the termination of their contract the right to exploit the remaining sand and gravel would revert to the petitioners. The above factual situation is within the rationale of our decision in the case of Samuel L. Green, 35 T.C. 1065 (1961), in which we held: that the petitioner-owner therein had not made a present sale of the *247 natural deposit (soil) in place; that the contracts therein only set out the terms at which the natural deposit would be sold from time to time, as extracted; and that the profit therefrom must be treated as ordinary income. The contracts in the Green case contained a provision that the soil did not become the property of the contractor until it was removed and the consideration was paid. Though in the case at bar the language of the contract would appear to call for a present transfer, when viewed in terms of the entire factual setting, we are led to conclude that the absence of an obligation, or an intent, to mine to exhaustion and the corresponding lack of a fixed personal liability on the part of Curtis to make further payments reveal that in fact the parties intended that petitioners would not relinquish their entire interest in the sand and gravel in place until actual removal and payment. See also Laudenslager v. Commissioner, 305 F. 2d 686 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 947 (1963). Petitioners here, as did the petitioners in Green, attempt to rely upon the Ninth Circuit's decision in Gowans v. Commissioner, 246 F. 2d 448 *248 (C.A. 9, 1957), reversing a Memorandum Opinion of this Court. Such reliance is misplaced. In the Gowans opinion three factors in combination were held to be decisive: (1) that the primary purpose of the contract was other than to exploit the natural deposit, namely to prepare the property for development as a real estate subdivision; (2) that the contractor was obligated to remove all of the sand; and (3) that the contractor was obligated to pay for all the sand contained within the deposit whether or not actually removed. None of the above factors is present in the case at bar. In fact, we are of the opinion that the absence of these factors in the case before us establishes a strong argument in favor of respondent under the rule of the Gowans case. See Laudenslager v. Commissioner, supra, footnote 4 at 692. Petitioners also place reliance on a number of cases [4] which would appear to follow the rational of the Gowans case. In these cases, though the contracts themselves did not impose an obligation on the contractor to mine or pay for all or a specified portion of the mineral in place regardless of extraction, the courts found that the sale of the entire interest had *249 taken place on the date of the contract, pursuant to the intention of the parties. All of the above cases are readily distinguishable from the case at bar because on the facts before us we have found that the parties did not intend that all or a specified portion of the sand and gravel would be transferred at the date of the contract. The parties herein intended that Curtis would remove an unascertained portion which it later required in order to complete its subcontract. This finding is buttressed by the provision of the contract which measured its duration not in terms of ample time to remove all the sand and gravel but rather in terms of the requirements of the subcontract. We are of the opinion that the parties by their contract intended no more than to set forth the terms at which future transfers to Curtis would be consummated at such times and in such quantity as it required them. See Samuel L. Green, supra; Laudenslager v. Commissioner, supra; and Schreiber v. United States, ( E.D. Wisc., Dec. 21, 1966, 19 A.F.T.R. 2d 342). *250 In conclusion, after consideration of all the facts of the instant case, we have found that the petitioners have retained an economic interest in the sand and gravel in place and that the amounts they received from Curtis were compensation for the exhaustion of that interest. It is our opinion, therefore, that the amounts received by Melvin and Richard under the agreement are properly taxable as ordinary income. [5]
Decisions will be entered under Rule 50. Footnotes
1. The parties have stipulated with reference to various other issues not raised either in the notices of deficiency or in the petitions. In light of these stipulations, a Rule 50 computation will be required in each docket.↩
2. The parties have stipulated that though the agreement denominates as "Seller" the "Edith A. Hair Estate," for reasons peculiar to local law, for the purpose of the cause at bar, the persons therein described as "Seller" were, in reality, Melvin and Richard. Neither Melvin nor Richard had ever previously engaged in the business of selling or marketing sand and gravel.↩
4. See: Linehan v. Commissioner, 297 F. 2d 276 (C.A. 1, 1961), reversing 35 T.C. 533 (1960); Robert M. Dann, 30 T.C. 499 (1958); Crowell Land & Min. Corp. v. Commissioner, 242 F. 2d 864 (C.A. 5, 1957), reversing 25 T.C. 223 (1955). There is some question as to the precedential value of the Crowell case even in the Fifth Circuit since that Court's decision in United States v. Witte, 306 F. 2d 81 (C.A. 5, 1962), in which the Court held that the taxpayer-land-owner had retained an economic interest. It did not discuss its earlier decision in Crowell though it did note by way of a footnote that it had been relied on by the taxpayer. See United States v. Witte, supra↩, footnote 6 at 85.
5. The parties have stipulated that if the receipts were ordinary income, then the petitioners are entitled to percentage depletion of 5 percent of the amounts received, in accordance with the provisions of sections 611 and 613 of the I.R.C., 1954↩.